Marion Ferrill **TUPPER** and Clara Tarbell Tupper, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 17542.

United States Court of Appeals
Fifth Circuit.

Sept. 30, 1959.

Rehearing Denied Dec. 17, 1959.

---

Ralph A. Franco, Montgomery, Ala., Louis Regenstein, Jr., Harry J. Mehre, Jr., Atlanta, Ga., Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., Hill, Hill, Stovall & Carter, Montgomery, Ala., of counsel, for appellants.

Paul Millirons, Asst. U. S. Atty., Ralph M. Daughtry, Asst. U. S. Atty., Hartwell Davis, U. S. Atty., Montgomery, Ala., for appellee.

Before HUTCHESON, TUTTLE and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The question for decision is whether the insured misrepresented material facts in securing the reinstatement of his lapsed National Service Life Insurance policy. The case was submitted to the district court, without a jury, solely on a written stipulation and a number of exhibits, including the insured's deathbed deposition. The district court held that the insured fraudulently procured the reinstatement of the policy [1] and denied recovery to the beneficiaries [2] of the policy. We reverse on the ground that there was no material misrepresentation.

## I.

The insured, Brigadier General Tristram Tupper, deceased, served with distinction in both World Wars. While on active duty in World War II he carried a National Service Life Insurance policy in the principal amount of $10,000, effective March 1, 1942. In 1950 he renewed this policy for an additional five year term. The policy provides for a grace period of thirty-one days for the payment of delinquent premiums after the due date for such premium. During the grace period the insurance remains in full force and effect. The insured paid premiums through January 31, 1952. He did not pay the premium due on February 1, 1952, either on that date or during the grace period which ran until March 3, 1952. Consequently, the policy lapsed.

April 16, 1952 the Veterans Administration advised General Tupper that the policy had lapsed and enclosed an application for reinstatement. The insured completed this form on April 26, 1952. On April 26 or April 27, the insured gave the form to a friend, Albert Love, who mailed it on April 28, 1952. The Veterans Administration received the application April 30, 1952 and reinstated

---

1. Tupper v. United States, D.C.M.D.Ala. 1958, 165 F.Supp. 399.

2. The co-beneficiaries of the policy are the widow and the former wife of the insured.

the policy without a medical examination.[3]

The reinstatement application is a standard form. The appellee contends that the insured's answers to three questions were false, material, made with knowledge of their falsity and with intent to deceive. Pence v. United States, 1942, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510. (1) In answer to question 10, "Are you now in as good health as you were on the due date of the first premium in default?", the insured marked "Yes" on the form. (2) In answer to question 11, "Have you been ill or suffered or contracted a disease, injury, or infirmity, or been prevented by reason thereof from attending the usual occupation, or consulted a physician, surgeon, or other practitioner for medical advice or treatment at home, hospital, or elsewhere, in regard to your health since the lapse of this insurance?", the insured marked "No" on the form. (3) In Block 12, entitled "Illness, Damage or Injury", the insured wrote: "Regular physical check-up—nothing physically wrong."[4] In reliance upon this application the Veterans Administration reinstated the policy without a medical examination.

II.

The medical history of the insured must be set forth in some detail. As early as November 1944 General Tupper suffered pain in the left lumbar region and along the left leg. He consulted several Army physicians from time to time. They diagnosed the condition consistently as sciatica and anemia. When the insured was separated from active duty in October 1945, his final physical examination showed that he was still anemic. Thereafter, as before, the pains continued intermittently, and the insured consulted civilian physicians at various times to receive treatment for sciatica and anemia.

On February 10, 1952, the insured consulted Dr. John R. Gill of Miles, Virginia, his neighbor and family physician. Dr. Gill diagnosed the insured as

3. Veterans Administration Regulation 3424, 38 CFR (1949) provides:
 "§ 8.23. *Health requirements*. National Service life insurance on any plan may be reinstated if application and tender of premiums are made:
 (2) On or before July 31, 1948, or within 3 premium months including the premium month for which the unpaid premium was due, whichever is later, provided the applicant be in as good health on the date of application and tender of premiums as he was on the due date of the premium in default and furnishes evidence thereof satisfactory to the Administrator.
   \*     \*     \*     \*     \*
 § 8.24. *Application and medical evidence*. The applicant for reinstatement of National Service life insurance, during his lifetime and before becoming totally disabled, must submit a written application signed by him and furnish evidence of health as required in § 8.23 at the time of application satisfactory to the Administrator of Veterans' Affairs and upon such forms as the Administrator shall prescribe or otherwise as he shall require. Applicant's own statement of comparative health may be accepted as proof of insurability for the purpose of reinstatement under § 8.23(a), but, whenever deemed necessary in any such case by the Administrator, report of physical examination may be required."

4. (1) Appellants contend that General Tupper answered "Yes" to question 10 because, at the time of the application, April 26, 1952, he believed that his health was as good as it was on the due date of the first premium in default, February 1, 1942. (2) They contend that he answered "No" to question 11 because, as he read the question, the clause "since the lapse of this insurance" limited the inquiry to events occurring after the expiration of the grace period, March 3, 1952. The policy provides: "If a premium is not paid before the end of the grace period, this policy will lapse as of the due date of that premium". Appellants argue this language keeps the policy in force until the end of the grace period; that the common understanding of the term "lapse of insurance" refers to the date of expiration of the grace period. (3) Appellants contend that the insured answered question 12 in fairness and in good faith, and that it put the Veterans Administration on notice that he had made visits to a doctor.

anemic and prescribed B–12. He gave the insured some codeine tablets to help relieve the pain. General Tupper returned one week later for Dr. Gill to determine if B–12 had any helpful effect. He made a third visit on February 22, 1952 for the same purpose. On this visit Dr. Gill performed a rectal examination and discovered that the insured's prostate gland was enlarged, nodular, and fixed. For the first time Dr. Gill suspected that the insured had cancer of the prostate gland; however, since the diagnosis was only tentative, Dr. Gill did not inform the insured of the possibility of cancer. There were no X-ray or laboratory facilities available in Miles, Virginia. Dr. Gill told General Tupper that he thought the pain was caused by the enlarged prostate gland and advised him to have a complete physical check in Atlanta, Georgia; he knew that the insured planned to visit Atlanta in March, 1952.

Apparently, General Tupper was unalarmed, for he delayed his trip to Atlanta until the middle of April. General and Mrs. Tupper drove to Atlanta in April to visit Albert Love, an old friend and business partner of the insured. Mr. Love made an appointment for the insured to be examined by Dr. Milton H. Freedman, a well known diagnostician, and the insured was examined on April 28, 1952. On April 29 X-rays were made for the first time. May 1, 1952, Dr. Charles Rieser, a urologist, examined General Tupper. Several days later, after the examinations, the X-rays, and a conference with Dr. Reiser, Dr. Freedman informed the insured that it might be necessary for him to have surgery. This was the first comment by Dr. Freedman to the insured about his condition. Dr. Freedman told the insured that the X-rays showed bone shadow which might or might not be serious. He suggested another examination.

The insured then returned to Miles, Virginia, and Dr. Gill arranged an appointment with Dr. Paul Buntz of the Grady Institute at Johns Hopkins Hospital. Dr. Buntz examined the insured May 12, 1952. He advised surgery at once. On the same day, the insured entered Walter Reed Army Hospital. There he was examined by Colonel James C. Kimbrough, Chief of the Urology Service. A needle punch biopsy revealed advanced carcinoma of the prostate gland with metastasis to the left and right humerus, spine, pelvis, and left and right femur. May 20, 1952, the insured underwent surgery at Walter Reed Army Hospital. The cancer was beyond the curable stage. All of the evidence now points to the fact that, unknown to General Tupper, he had cancer for ten years prior to the time of his death. The insured was discharged from the hospital June 2, 1952 but continued to receive treatment as an out-patient. After subsequent brief periods of hospitalization at Walter Reed, he returned to Miles, Virginia. General Tupper remained under the constant care of Dr. Gill until his death, December 30, 1954.

On February 2, 1954, the insured filed a claim for waiver of premiums in which he stated that he was totally disabled from October 5, 1945 because of cancer of the prostate with metastasis. By a letter dated February 24, 1954, the Veterans Administration informed the insured that his visits to Dr. Gill were inconsistent with his representation in the reinstatement application that he had not been ill or consulted a physician and asked him to explain this discrepancy. The Veterans Administration was not satisfied with the insured's explanation [5]

---

5. The insured's letter of March 19, 1954 to the Veterans Administration stated, in part:
   "My third and last visit to Dr. Gill was on February 22. He gave me another check-up, including a rectal examination—the first I had ever had. Again he assured me that my heart, lungs, kidneys and other vital organs were normal. Also he said my prostate gland was enlarged and that he believed this was the cause of the pains in my back and leg. He told me to stop working so hard and advised a thorough examination at an early date. I told him I expected to

and cancelled the reinstatement of the policy.

The beneficiaries filed a joint claim with the Veterans Administration and, after exhausting their administrative remedies, filed suit in the federal district court and now appeal from an adverse judgment.

The district court based its decision on failure to disclose fully and in good faith his three visits to Dr. Gill between February 10 and February 22, 1952. We do not reach the question of intent to misrepresent, or some of the other questions (such as what is meant by the "lapse" of a policy), because we hold that failure to disclose was immaterial, since the state of health of the insured was no worse when General Tupper filled out the reinstatement application than it was on February 1, 1952, when the last premium payment was due.

### III.

█ If the insured's health at the time he filled out the reinstatement application was as good as or better than it was on the due date of the premium in default February 1, 1952, then, as a matter of law, the insured was entitled to have the policy reinstated. The applicable regulation of the Veterans Administration, 38 CFR 8.23, provides, in part: [6]

"National Service life insurance on any plan may be reinstated * *

\* \* \* \* \* \*

" \* \* \* Provided the applicant be in as good health on the date of the application and tender of payments as he was on the due date of the premium in default and furnished evidence thereof satisfactory to the Administrator."

The uncontradicted opinion of the medical experts is conclusive that the insured's cancerous condition had existed for at least ten years before his death, and that his condition did not change to any appreciable extent during February 1952. Dr. Freedman stated in his affidavit:

"In view of the type of cancer that I found, and the history of the case, it was my opinion that no substantial change took place in his condition during the months of February, March and April of 1952, and I believe that he was in approximately the same condition of health in this respect on May 1, 1952 as he was on February 1, 1952."

Dr. Rieser stated:

"I found in my examination that General Tupper had adenocarcinoma of the prostate gland with extensive metastases. It was of the slow growing type and was of long duration. It is my opinion that in the three month period prior to my examination of General Tupper the progress of this disease was so slight as to have no material significance. I think that he was in approximately the same condition of health in this respect on February 1, 1952 as he was when I saw him on May 1, 1952."

Dr. Gill's affidavit is essentially the same in this respect:

"Long prior to February 1, 1952 General Tupper had carcinoma of the prostate gland with extensive metastases. This condition was a very slow developing type, and during the three month period to which

---

finish the work I was doing sometime in March and proposed going to Atlanta for a business conference and a long vacation. He said, "Have one of those good Emory diagnosticians give you a thorough going-over while you are in Atlanta * * *.'

"There was nothing alarming in what Dr. Gill said or the way he said it. He did not tell me or indicate

there was anything serious in my condition. In fact, if an enlarged prostate was the cause of the pains I had suffered, intermittently, through the years, this condition must have existed since 1944 and consequently I had no feeling that it was of a serious nature."

**6.** See footnote 3.

I have referred, any change would be hardly noticeable, if at all. I think it is fair to say that the condition of his health of February 1 and on May 1, 1952, insofar as this condition of carcinoma is concerned, was substantially the same."

Colonel James C. Kimbrough, Chief of the Urological Service at Walter Reed, stated in proceedings before an army board for correction of military records that the insured had cancer of the prostate with extended metastasis as early as October, 1945. The statements of two other army physicians, Dr. Lewis and Major Rodriguez, testifying before the same army board, were that the insured was suffering from cancer when he was discharged from the army in October, 1945.

The undisputed medical evidence is that the insured's condition was hopelessly incurable long before February 1, 1952, that the adenocarcinoma of the prostate was "of the slow-growing type", and that "he was in approximately the same condition of health on May 1, 1952 as he was on February 1, 1952". Accordingly, misrepresentations, if any, were immaterial; the insured was entitled, as a matter of law, to reinstatement of the policy under the regulations of the Veterans Administration.

■ The requirement of 38 CFR 8.23 (a), that the evidence of good health be "satisfactory to the Administrator", gives the Administrator considerable discretion. But it is not an uncontrollable discretion. The Administrator will not be permitted to act unreasonably or arbitrarily, and his decision is subject to review and correction. The requirement that the evidence be "satisfactory" to an administrative officer "does not authorize denial of a claim if the undisputed facts established its validity as a matter of law." Dismuke v. United States, 1936, 297 U.S. 167, 172, 56 S.Ct. 400, 404, 80 L.Ed. 561. Here, we find that the undisputed medical evidence admits but one conclusion as to General

Tupper's state of health; on the medical facts, his state of mind is immaterial.

The judgment is reversed, and rendered for the appellants.